24, 1985, Republican National Committee et al. versus Jocelyn Benson et al., oral argument not to exceed 15 minutes per side. Mr. Woodfin for the Plaintiff's Appellants. Good morning, your honors. Good morning. Honor Woodfin for the Republican Party Appellants. Before I begin, I'd like to reserve three minutes for rebuttal. Sure. May it please the court. The mission of the Republican National Committee is to turn out Republican voters and to elect Republican candidates. When states fail to remove ineligible voters from their voter rolls, it makes it harder for the Republican National Committee to turn out Republican voters and to elect Republican candidates. Michigan has some of the worst maintained voter rolls in the country. Over half the counties in the state have more active register voters than there are voting age citizens living in those counties. The defendant's failure to maintain their rolls injures the Republican Party and violates federal law. I'd like to start. Can I ask you one thing on that statistic, which is, I agree, a striking statistic, but the way the act works is it sets up all these procedural rules for pulling someone off the rolls, including, I think, the most important one, that you've got to wait two elections after a notice. And if you have a state where there's net migration, there, of course, is going to be a lag between the registered voters lining up with the population. So I'm not sure that, I guess the point I'm making is I'm not sure that statistic is as striking as you suggest it is. So two reasons it's striking. First, it's striking because compared to other states, it's significantly worse. Yeah, but that just takes you back to, is it a net migration or immigration state? Well, okay. Then I would just point you to the other cases in which these statistics have been held to state a claim. We cite half a dozen district courts in our brief in which district courts have looked at this exact methodology that we employ here, comparing the citizen voting age population and the Census Bureau data to the current most up-to-date voter registration records in the state. And I would note every one of those district courts held that it does state a claim, having a significantly high voter registration rate or an impossibly high voter registration rate states a claim. And the numbers here are far worse than any of those complaints, all of which survived a motion to dismiss. So this is ACRU in Texas. This is Gaunt v. Benson in the very same state, Michigan, in 2020. This is Green v. Bell in North Carolina. This is Bolido v. Snipes in the 11th Circuit. Every one of these cases- Let me try to just tell you where I'm coming from and see if you can address some of those issues. I'll tell you a way in which I think you could state at least injury. So the way you might state injury, which I don't think is the way you've pled this complaint, but you tell me if I'm wrong. The way you might state injury is you say in a given county the registered voter number is 3,000 and the population is 2,000. And you say, we send out a get out to vote card to all 3,000. Our injury is the fact that we're sending something to 3,000 people and there are really only 2,000. So that's an injury. That's economic loss and you could maybe even say it's impending in an injunction setting. I don't think that's how you've pled this case, but let's just say for the sake of argument you have, you're still stuck with a causation issue. And because the act is not directly regulating you, so you kind of start in a situation where it's a little harder to show standing because you have to rely on actions of third parties. So how can you plausibly allege standing when we have all these questions about why the lag, which it might actually be that the Secretary of State is complying with the rule that you have to wait two election cycles before you move someone off. It's just pure speculation. So we don't think it's speculation because this evidence has been supported by other courts, but also the defendants. Telling someone a bunch of district court decisions is, you can keep doing that, but it's not going to resonate with too many people. So even if there is some other alternative explanation, that doesn't defeat a reasonable inference that the voter rolls are inflated. And second, the defendants can't explain and they don't even try to explain how much this lag could account for the bloated voter rolls. So maybe it explains 10%, 20%. There's still counties that are 20, 30% over whatever that lag period can explain. And so that would be what we say is an unreasonable effort to maintain those voter rolls. I would like to go back to... Would you say the complaint fairly states that you're going to mail something to every one of the registered voters? We think so. Where does it say that? Where does it say, next election, we're going to be mailing to all these people in whatever, 30% of them aren't registered, aren't there. That would be additional detail. We think the allegation there would be in paragraphs 16 and 17 of our complaint, where the RNC alleges that it sends out mailers, it knocks on doors, and all of these things are activities that rely on voter registration lists to be effective. And so we think that allegation is in there, specifying a particular county might be additional detail that is relevant at the summary judgment stage. But in Havens, the allegation was very straightforward. And going back to the injury to the organization, we think this just tracks exactly with Havens. It's an informational injury. The NVRA requires states to publish accurate voter rolls and to maintain those voter rolls. Looks like a diversion of resources injury, and that's what is not left of Havens. That's precisely, in fact, Havens looks like it's a money damages case. This is an injunction case, I've got that right, right? Your case is injunction. That is a difference with Havens. That's a pretty big difference given Clapper and, you know. We think the difference there really goes to when there's an organization predicting a future injury, and then seeking an injunction to prevent that future injury here, we're predicting an ongoing injury, so we don't have to, we're not predicting the actions of some independent third party in diverting resources for that reason. And I acknowledge we do use the language of diversion of resources in the complaint. That's of course because we drafted this complaint before Alliance for Hippocratic Medicine when the case law did focus on that language. But now post-Havens, it's clear diversion of resources is not the injury itself, and we don't claim it is. We've never claimed it is. The injuries are the injuries to the RNC's activities, its efforts to turn out voters, to send out mailers, to knock on doors, to form its plans and budgets. Those are all activities that the RNC takes as part of its daily operations to achieve its mission. And... But the thing that's just so hard for me to get my head around is the Act's not regulating you, so we already have that problem. You don't like the idea of knocking on a door where the person no longer lives there. So they're, you know, they're a registered voter, but they're no longer there. They've moved to whatever, Minnesota. That's not a... That seems like a redressability problem. I don't... That can't be fixed. And by the way, if that's enough for Article 3, it seems to me Havens is the rule, not FDA. Havens is very much the exception to the rule right now. We think you should be skeptical of diversion of resources in two scenarios, and we think this is what NAACP says that this court decided last week. The first scenario is when an organization is diverting resources to remedy the injury of some third party, and it's that third party that's regulated by some law that the organization wants to challenge. They're diverting resources to help them avoid an injury. That's not what's going on here. The RNC suffers these injuries directly. And it's also not challenging a law. It's alleging a violation... But the law does not regulate RNC. That's true, but Havens very clearly says, and Alliance for Hippocratic Medicine affirms, that just because a law doesn't regulate an organization doesn't mean an organization doesn't suffer an injury. And Alliance even underscores that an informational injury would have satisfied standing in that case. The only problem was the plaintiffs didn't claim one. And it wasn't clear that federal law required the FDA to produce this accurate information. Here both of those boxes are checked. The NVRA does require accurate information on voter registration lists. We're alleging they're violating that provision, and we're alleging that that injures the RNC. And so that falls exactly within the kind of injury that Alliance for Hippocratic Medicine says. What do we do with the language of the complaint that says, we may spend, we may divert resources, we may have to spend? So we explain in our opening brief that the word may there is conditional. In that sentence we're describing the actions that, the electoral actions that the RNC takes in the lead up to an election, in that case it was the November 2024 election. And so I haven't heard a rebuttal on the other side as to why that language should be read as hypothetical as opposed to conditional. And we think construing that. It certainly doesn't sound like CLAP or imminence language. Well reading it as conditional language. That's the standard to me. So reading it as conditional language, we do think it is. It's the RNC takes part in these activities leading up to an election. And when it relies on voter registration lists, it makes those activities less effective and more expensive. Those are classic Article III injuries. If you think that the word may must be read as hypothetical, then we would just say, you know, if all it takes to vest the court with jurisdiction is change the word may to will, we could do that in amendment. We just think reading that. Well, the word is impending or not impending. It isn't semantics. It's like a real thing. That's the whole point. So that we're not just refereeing every dispute people have in going to federal court because they don't like exactly how the Secretary of State of this one state is implementing a federal law and it hurts this political party indirectly. I mean, that's the whole point of the Alliance decision is to and CLAP or to bring some discipline to this area. We would say, I mean, the next election, the next federal election in 2026, the midterms, that is certainly impending. That will happen. These are injuries that the at least this set of electoral injuries in sending out mailers. These are things the RNC engages in in every election cycle. And so those are certainly impending. And the injury itself is ongoing because the we're not alleging a future violation merely. We're alleging that there is an ongoing violation of the of the NVRA in failing to remove the voter rolls. And that one is vote. What is that one? Fraud dilution. What's that? Well, we also allege fraud. That would be when you say I'm going, I'm just trying to figure out what you mean. Like today. What's the injury today? You're experiencing the injuries. It harms the RNC's ability to form its plans and budgets to make effective electoral strategies. The injuries impending in the future would be, you know, sounds like the doctors in the Alliance case. Well, the difference is the doctors were forming plans and strategies to educate voters. It was an abstract mission. These are plans and strategies for the RNC's business activities. These are core activities that it engages in every day, not for the benefit of some third party, but for the benefit of itself. The RNC, more than any other organization in the country, relies on electing candidates and voters to vote Republican for its continued existence. If that doesn't happen, then the RNC ceases to exist. I see my time has expired. I don't understand why this is not complete speculation. I mean, it seems all you have is this assertion that there are more people, there are too many people registered. And then from there, you want us to assume that the explanation is that they're not following the law. But right within the law is an explanation. So why isn't this just a completely speculative complaint in terms of violating? The law provides for a procedure, not an outcome. So why isn't this too speculative? Two reasons. So the law requires a reasonable program. So that's the violation, or a reasonable effort to conduct a general program. So we think this requires you to accept, at least our simplest claim, requires you to accept two premises. The first premise is that impossibly high voter registration rates in numerous counties raise a plausible inference that a state is not making a reasonable effort to remove voter rolls. That legal premise is supported by the half dozen district court cases. But the factual premise, and I'll just note, no court has rejected that legal premise yet. The factual premise is we allege over half of Michigan's counties have more registered voters than they have citizens living in those counties. Now... But what in that allegation is intrinsically challenges the procedure? I mean, the procedure tells you what you have to do. You have to wait two years. Right. And consistent with that procedure would be a situation where there are people who have moved out who are still on the rolls. So... And I don't think you've made an allegation with a statistical basis that says that even assuming that, and assuming this, and assuming that, there's a model that tells you that these numbers are just off. So we don't think there's anything unusual about relying on statistics to raise a plausible inference. I think what... No, I'm saying I don't see the statistics. All I see is that there are more people than you think there should be. So I think what raises this to a plausible claim is the fact that it's an impossible number of people. Is what? An impossible number of people on the voter rolls. It's just not possible to have... I think that's what she's saying. You say that. Where in the complaint is the statistical analysis that shows that's right? I mean, I love your conviction. You seem like a nice guy. I don't think you're lying to me. But I have no idea why you're saying that with conviction. I don't know how you can say it with conviction without some statistical analysis proving that. And even if you did, you're just doing it statewide. You're not even doing it county by county. So that just takes you back to the speculation of where you're going to put your efforts. Is the statewide problem actually one you're going to fix with the efforts in the counties you're going to? So we think that goes to the second premise, which is a factual premise that... Can I just ask you one question? I'm going to let you finish that one, but I'm just really curious your answer to this. You had the misfortune of writing this complaint before Alliance. Let's say one thinks the current complaint is deficient, but let's say one also takes the view that dismissing on lack of jurisdictional grounds is without prejudice, and then in this case, you should have an opportunity to try a new complaint if you want one. Why would you care? Isn't that a great situation? I mean, it's got to be better to write the complaint after Alliance. So... The main language can disappear if you think it's misleading. If you need to show some statistics to try to show how this really is impending, and not speculative, you can make those kind of allegations. What's the loss to you if that's the verdict? If the verdict is a remand to allow us to amend, of course, we request that in the alternative. I know, I know. I'm asking why isn't that just like, I'm smiling. We would be happy with that. We would be happier with a holding that we state a claim and have standing under this  But, you know, of course, we think amendment is proper in this case. Now, I would like to go back to this first question. So this factual premise, we think, you know, showing our work in the calculations is the kind of proof and evidence that would be appropriate for summary judgment. But it's a factual allegation. The court called it an opinion, but it's really a factual allegation that 53 Michigan counties have more registered voters than citizens over the voting age population. Right back to Judge White's question. That by itself does not tell you anything, given the procedural protections and time lag on removing people from the rolls. And so then we would fall back to, you know, the courts that have said that's the degree of what's causing the problem there is a factual question. The 11th Circuit said that. And, you know, just again, I would just fall back to this as a possible question. I quite agree with the degree point. And I find this area of law very difficult. But it just seemed to me really funny that we're trying to navigate the hardest features of this when my suspicion is it would be a lot easier case for you and a lot better for us to try to write a complaint that knows about Alliance, knows that Havens is now the exception, not the rule, and tries to come to grips with that, keeping in mind it really is a spectrum with some hard calls along the line. But we're being asked to make, in my view, a very difficult call. And that, I mean, maybe I'm just frustrated with I want an easier job, which is not a great answer. I'll acknowledge that. I won't frustrate you. I'll say that. All right. You get your full rebuttal. Thank you. All right. So we have the Michigan Attorney General's office. Can you hear us? Yes, I can, Your Honor. Can you hear me? Yes. Yes. Go ahead. Thank you. Good morning, Your Honor. I may have pleased the court, Assistant Attorney General Eric Brill, appearing on behalf of the appellees, Michigan Secretary of State Jocelyn Benson, and Director of Elections Jonathan Frater. The order dismissing the RNC's complaint should be affirmed because the RNC failed to establish its standing, and because the complaint as a whole simply failed to state a possible violation of the NBAA. First, the RNC wants to argue that it has standing, but that really isn't the question. The real issue is whether they made allegations in the complaint establishing their standing. And there is a difference there, and that difference is especially important where they were given the opportunity to amend and chose not to. As a consequence, they are badly positioned now to ask for a lenient reading of the same allegations that the motion to dismiss identified as deficient. Do you agree that if we affirm the motion to dismiss on jurisdictional grounds, it would be without prejudice? That is my understanding, Your Honor. And if it's without prejudice, that means they could file a new complaint, which is a little easier and a little fairer, since they would now have alliance when they didn't have alliance when they filed the first complaint. I agree that they could file a new complaint, and honestly, for all of the reasons I think that counsel has already discussed about the allegations that they want to make, we would welcome a well-pleaded complaint, but that's just not what we had here. Can I ask you one other question? I appreciate that answer. There's maybe a debate about whether they've pled this, but let's just say it's fair to say they have, and I'm now focused on injury. Wouldn't it be an injury, even for an injunction purposes, to say, listen, we've pled that in this county, there are 3,000 registered voters, and at any given point presently, there's no more than 2,000 residents in this county. And every two years, we mail out get-out-to-vote cards to all 3,000 registered voters. That difference of 3,000 versus 2,000 costs us something. That's not really a diversion of resources. That's just spending money on something that's useless. That person is no longer there. Wouldn't we have to say, wouldn't that be an injury? I realize there's a causation point, but if that was what was pled, wouldn't that be an injury? And they say we're about to spend it in the future, like, this is what we normally do, and so next election, we're going to waste money on the 1,000 mailings in that county, and then multiply it by the number of counties in Michigan. That seems to be an injury, isn't it? I apologize, Your Honor. For the first time in a year, I had a little lag in my network there, and I'm sorry, I didn't hear the part of your question. Yes, no worries. Let's just say what they've pled is, in this county, there are 3,000 registered voters. At a given time, there's only 2,000 residents. Every two years, we mail out a get-out-to-vote Republican ballot to all 3,000 people. That's a waste of our money. That's a financial injury when we're sending it to 3,000 people, and there's only 2,000 voters. If that's what they pled, that would be an injury. Put causation to the side, but wouldn't that be an injury? I think there are two responses to that question, Your Honor. First, as I read the court's recent opinion in the Tennessee Conference of the NAACP, I'm not sure that it would be, because in that case, the court said that the president of the NAACP had asserted that this is how we've used resources in the past to address this kind of wrong, and the court said that that wasn't enough. The specific language was that they did not introduce into the record a single specific example of actual costs incurred. But my hypothetical gives you that example in that county is 1,000 mailings, which are whatever, worth $500. That would be a step in the right direction, Your Honor. I'd have to see the actual obligation to state with certainty, but as suggested by the court's hypothetical, I think that that would be a sufficient basis to say at least to get their foot in the door. How do you respond on causation, and I guess this relates to the speculation point. How do you respond to, I think what counsel was saying was, okay, fine, there is a lag effect with people migrating out of the state, and it takes four years for someone to be pulled from the rolls, but that might explain 20% of the gap, but it can't explain all of it. How do you respond to that argument? So I think that's a causation point, from what I can tell. And I'm just kind of curious if he's filling the causation gap by saying, listen, there is a cause here, and the reason there's a cause is the state can't explain that differential. Back to my example, 3,000 registered voters, only 2,000 residents. I think what he's saying is migration could explain 2 to 300 people, maybe 400, but it can't explain all 1,000. And so therefore, go ahead. No, go ahead, go ahead. I think part of the problem we're dealing with, Your Honor, is that there is an inherent problem with plaintiff's theory that we tried to address and raise in the motion to dismiss, and it's never really been adequately addressed in all fours, which is that there is a flat misreading of what the data here actually suggests. And I think going to the court's earlier question about the problem here, the analysis, is that there really isn't one. But I think even if we can accept the idea like, okay, there is a certain number of migration, and it's higher than normal, it's less about causation, I think, and I think this more goes toward whether a 12B6 settlement claim, whether they plead a plausible claim for relief. Because the problem there is that what they're alleging is premised on, well, we have this number, we don't have an explanation for it, but they don't really grapple with why. And they don't address what is wrong with the statute. But then they respond, you know, it's 12B6 or 12B1, and we're just talking plausibility, and it is true. They don't need to have a statistician for the complaint to survive. I think that's a fair point. Well, I think what they do need to be able to state, though, is an actual statement of relief, what they want us to do differently, what would make Michigan's program reasonable, or make it a reasonable effort under the NVRA, as pleaded in the complaint as it stands now, all they say is an injunction ordering the state of Michigan to comply with the statute. What does that tell us what to do? If the court were to grant that, if they had moved for a preliminary injunction directly to Michigan to do that, what would we be doing differently? In other words, what is the plausible claim here? How can their claim be plausible if they can't even explain what's wrong with the program? Well, they say that, you know, unkindly, that Michigan's one of the worst in the country. No one else agrees, Your Honor. In fact, by many standards, we're running one of the best. What they're relying on is this idea of this high number, supposedly, of ineligible voters, but that doesn't match up. The only reason they have that number in the first place is because Michigan sent out in 2020 a mass mailing to all of its registered voters to give them an opportunity to vote for absentee during that ongoing pandemic. That hadn't been done in decades before that point. So as a consequence, we had a lot of actual data in terms of people who weren't responding to that message, to that letter, a lot of return mail, and so that placed a lot of people on what we refer to as the countdown, that after two election cycles, they will be removed, and a lot of those voters will be removed in the 2026 and 2020 election cycles. What year was that, 21, that you did that? It was during the pandemic, so it would have been the 2020 election. So during 2020, you sent that, okay. And this complaint was filed, the complaint was filed in 23 or 24? It was in 24. But that's based on the census data available at the time. So this is what they're trying to compare to, and they're using the QBF and the list of all these people, but the problem is, and one of the problems alleged in, excuse me, one of the deficiencies addressed in Director Brader's letter was you're using active and inactive voters together, which doesn't work. For the premise of the plaintiff's claim to work, they need to have an impossible number of active voters, and that's not what they have. They have a high number of all voters, including the ones we've already identified and marked for removal. So getting back to the issue of standing, I fully expected the NRC to file an amended complaint once the court entered its order granting them leave to do so. Instead, they chose to stand pat. Well, I mean, maybe I'm, am I remembering this correctly? This is the district court decision that moved on and also alternatively ruled on 12B6 grounds, right? It ruled on standing, and if you look at the court's actual judgment, it dismissed only on the basis of standing. No, I'm not making that point. I'm trying to, I'm being a little bit sympathetic. Maybe even empathetic with their decision because there's also a 12B6 ruling. I agree with you, it's a jurisdictional ruling fundamentally, but that might explain why they appealed is all I'm saying. Oh, no, I apologize, Your Honor. What I'm referring to is once we filed our motion to dismiss, the court entered an order giving the NRC leave to amend. If, and the court's order specifically said, if you don't move, if you don't amend your complaint, I'm going to rule on the motion to dismiss. So I kind of expected at that point that the RNC would amend their complaint, address what we identified as deficiencies, and we would go forward from there with whatever the complaint was. That's not what happened. They stood back, they held on to their complaint, they responded to our motion to dismiss, and the court continued to rule on it. So the idea that, well, we should be inferring, we should be giving them a lenient reading, they should be allowed to change. They were given the opportunity to change, and they chose not to. So I think now that presents them a problem where they want to make stronger arguments now and appeal about what they would have alleged, what they would have wanted to argue, than they actually made during the event. But you're not changing your earlier answer that an affirmance would be on lack of jurisdiction grounds, which is without prejudice. No, not changing it at all, Your Honor, and I think that's just the way we are. If you ask me, that shows the cleverness of their strategy. They went either way. They get the thing reversed on 12b-6 grounds, which is great law for them, or they, plan B, is write a new complaint. Well, and again, I don't think the court would necessarily reverse on 12b-6 grounds. No. Because if the decision is that the pleading lacks standing, then that is on basis of jurisdiction, and the court need not reach the 12b-6 portion. Right. One of the things the RNC has argued, and I think argued again this morning, is that their operations were stymied and interfered with. But again, that was never actually alleged in the complaint. Even in its arguments to this court this morning, the RNC cannot point to any allegations in its complaint showing how its operations were actually affected in any specific way. There are no allegations that resources were actually misallegated. There are no allegations that money was actually spent. They don't identify one thing that they did differently as a result of any supposed defect in Michigan's legislation. Didn't they say they were knocking on doors they shouldn't have knocked on? They don't. They said that this morning, Your Honor, but that's not in the complaint. They come in the complaint. The closest allegation they get is in paragraph 23 of their complaint where they state that because Michigan does not maintain accurate order lists, the RNC must deploy timed resources. And that's a better allegation, but it's still deficient because it stops just short of saying that they actually did deploy any resources or use any time. As this court's aware, when courts address standing, they look at the fact that this thing at the time the complaint was filed. The RNC needed to allege that it suffered some injury in fact, which was concrete, particularized, actual, and imminent, and one that was traceable to the defendant's conduct. And the RNC here just didn't. This isn't, as the court's well aware, establishing the standing is not merely a pleading requirement. It's an essential part of the plaintiff's case. And that's particularly curious here where the RNC, as an organization, clearly knows this. The RNC made the allegations it needs to make in the North Carolina case, and there was no reason they couldn't have made those exact same allegations in this complaint, but they just simply failed to do so. Even after being invited to do so by the district court. I've got about two minutes left here, so I do want to spend some time addressing the substance of the claim, or the possibility of the NBRA claim. Again, the plaintiffs don't dispute that we have a program that there is. The components of this maintenance program are a matter of public record. Moreover, Section 8 of the NBRA provides them with the opportunity to hold documents regarding the implementation of our program. And lastly, out of the 27 counties identified by the plaintiffs as being in excess of 100%, 17 of those counties, by my unofficial count, are operated by county clerks who identify as members of the Republican Party. So there are available opportunities for them to know exactly what our program consists of, what we do to implement them, and how they are operated. And those allegations just aren't in the complaint showing how we're falling short, what accounts for, what demonstrates that our program is the reason for these supposed excesses, rather than some defect in their analysis. Instead, the entire complaint is premised on the theory that Mission's program is simply not good enough. But under this court's recent decision in Public Interest Legal Foundation v. Benson, we have a definition now of what constitutes a reasonable effort. It's a serious attempt that is rational and sensible, need not be perfect or even optimal, so long as it remains within the bounds of rationality. And what is in this complaint demonstrates that some aspect of Mission's program doesn't meet that standard. And there's no demonstration or no allegation of the relief they're seeking that would ameliorate or resolve any of those supposed deficiencies. And in the absence of that, they simply have not stated the claim that it's possible under the Supreme Court's rulings, such as Iqbal, Antwane, and the rest. Thank you, Mr. Grill. We appreciate it. Thank you. So, Mr. Woodfin, I think you have some rebuttal. Thank you, Your Honors. Just a few brief points on rebuttal. First, I'd like to start with that Fourth Circuit case that was just mentioned. That was on a motion to dismiss. It was at the pleading stage. And we think the allegations we have in our complaint are not substantially different from what the RNC pleaded in that case. And, of course, the Fourth Circuit did find standards. On the 12B1 point? On the 12B1 point. It was a slightly different NVRA claim on the merits. On the merits, yes. But on the standing, the allegations, we think, are substantially the same here. I heard it said that Chief Judge Diaz wouldn't agree with that. I think so. I would just point to the knocking on doors. I heard that that wasn't in our complaint. Let's say that is in the complaint. Obviously, if you knock on a door and someone answers, who cares, right? That's good news, right? You're meeting someone. You can go Republican. So is the downside that you're knocking on a door of an empty house? There are too many empty houses. Of an empty house? Of an ineligible voter? So the RNC formulates its strategies for these get-out-the-vote efforts and these turn-out strategies. You wouldn't even go to a county, is the point. Or you wouldn't go to a neighborhood. Well, it's also about allocating staff and resources. So if a jurisdiction shows more registered voters, then the RNC isn't going to spend resources registering voters. It's going to spend resources turning out voters. That's like classic diversion of resources. One county, one place versus another. Well, the difference is, those resources are being diverted for daily operations that are critical to the RNC's mission. So it's not diverting resources to help some third party. And this goes to NAACP and what we think Havens is really getting at. It's not diverting resources to help some third party avoid an injury. It's to further the RNC's daily activities. And that's the kind of resource diversion that Havens requires. It still requires a consequent drain on an organization's activities. And economic injury is still injury even under organizational standing. I'd also just like to briefly touch on this causation issue since it's been discussed that this lag time could maybe partially explain these voter rolls. If that's true, then that would mean that no matter how bad a state's voter rolls get, just no plaintiff is permitted a plausible inference from that fact alone just because it could be explained by this lag time. And we just don't think that that's what the reasonable effort provision requires. It requires a reasonable effort to conduct a general program to remove voters. We think we've stated enough in this complaint to meet that standard, but we're happy to hear that remand is also appropriate. Thank you very much, Mr. Woodfin, and thank you very much, Mr. Grill, for your excellent briefs and arguments. We really appreciate it. It's a very tricky case, so it's excellent for us to have great counsel. So thank you very much. The case will be submitted.